

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-21-2001

# USA v. Weaver

Precedential or Non-Precedential:

Docket 00-2203

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"USA v. Weaver" (2001). *2001 Decisions.* Paper 214.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/214

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 21, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 00-2203

UNITED STATES OF AMERICA

v.

RUDOLPH WEAVER,
        Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal No. 99-cr-00002E)
District Judge: Honorable Sean J. McLaughlin

Argued March 15, 2001

Before: RENDELL, AMBRO, and BRIGHT,*
Circuit Judges

(Filed: September 21, 2001)

        Thomas W. Patton, Esq. [ARGUED]
        Office of Federal Public Defender
        1001 State Street
        1111 Renaissance Centre
        Erie, PA 16501
Counsel for Appellant
Rudolph Weaver

_____
* The Honorable Myron H. Bright, Senior Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by designation.

        Bonnie R. Schlueter, Esq. [ARGUED]
        Office of United States Attorney
        633 United States Post Office
         & Courthouse
        Pittsburgh, PA 15219
        Counsel for Appellee
        United States of America

OPINION OF THE COURT

RENDELL, Circuit Judge.

Rudolph Weaver appeals his armed robbery conviction on
the grounds that the jury pool in the Erie Division of the
Western District of Pennsylvania, from which the jury that
convicted him was chosen, did not reflect a fair cross
section of the community as required by the Sixth
Amendment and the Jury Service and Selection Act. Weaver
also challenges other rulings of the District Court based on
the Jencks Act and procedures he claims are required in
order to sentence him under the "Three Strikes" statute, 18
U.S.C. S 3559 (c)(1). The District Court found no violation of
Weaver's constitutional or statutory rights. We will affirm.

I. FACTS AND PROCEEDINGS

On December 21, 1998, Weaver entered the First
National Bank in Erie, Pennsylvania, waving a gun and
demanding the cash in the tellers' drawers. He threatened
to shoot the tellers if they did not comply with his orders.
The tellers emptied the contents of their drawers into
shopping bags, and Weaver left with approximately
$20,000. Later that day, bank surveillance photographs
taken during the robbery were shown on news programs,
and a former classmate of Weaver's, Mary Giulianelli,
communicated with the F.B.I. immediately after the evening
news to identify Weaver as the man shown in the photos.
App. at 767-68. The following day, Agent Van Slyke showed
a photo array to Rosalie Landon, one of the three tellers on
duty that day. Coincidentally, Landon had helped Weaver
open an account at the bank several months before the

2

robbery. She identified Weaver as the robber. App. at 502–03.

In January 1999, a grand jury returned a two-count indictment charging Weaver with bank robbery in violation of 18 U.S.C. S 2113(a) and use of a dangerous weapon in connection with a bank robbery in violation of 18 U.S.C. 2113(d). Weaver was arrested on March 25, 1999. On February 10, 2000, as required by 18 U.S.C. S 851(a), the government filed notice of its intent to seek a mandatory life sentence pursuant to 18 U.S.C. S 3559(c). The case proceeded to trial on March 21, 2000. The evidence was overwhelming: Weaver's girlfriend, Ethel Mae Wheat, testified that Weaver told her that he had robbed the bank and showed her a briefcase containing several thousand dollars. App. at 720. In addition, Wheat's son testified that he owned a gun similar to the one in the photographs, which had been missing since the time of the bank robbery. App. at 634–35. They also identified certain clothing belonging to Weaver, which was the clothing identified by witnesses as having been worn by the robber. App. at 639–41, 732–34. In addition, three of Weaver's acquaintances testified that they believed the man in the surveillance photographs to be Weaver. On March 24, 2000, a jury found Weaver guilty on both counts. In an amended judgment of sentence entered on July 24, 2000, the District Court sentenced Weaver to life in prison and ordered him to pay restitution in the amount of $31,051.30.

The District Court had jurisdiction over Weaver's criminal prosecution pursuant to 18 U.S.C. S 3231. We have appellate jurisdiction pursuant to 28 U.S.C.S 1291 and 18 U.S.C. S 3742. We review the District Court's findings of fact for clear error, and its legal conclusions de novo. United States v. Scott, 223 F.3d 208, 210 (3d Cir. 2000). Whether a defendant has been denied his or her right to a jury selected from a fair cross section of the community is a mixed question of law and fact, and is reviewed de novo. United States v. Allen, 160 F.3d 1096, 1101 (6th Cir. 1998); United States v. Miller, 771 F.2d 1219, 1227 (9th Cir. 1985); see also United States v. Grisham, 63 F.3d 1074, 1077 (11th Cir. 1995) (holding that constitutional challenges to jury selection process are reviewed de novo).

3

II. DISCUSSION

A. Challenge to Fair Representation in the Jury Pool

Weaver challenges his conviction on the grounds that he was denied his right to a jury drawn from a fair cross section of the community as required by the Sixth Amendment's fair cross section provision1 and the Jury Selection and Service Act of 1968, which codifies the Sixth Amendment right. He argues that the pool from which his jury was selected underrepresented African-Americans and Hispanics due to its exclusive reliance on voter registration lists.

"[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community. . . . [I]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." Taylor v. Louisiana, 419 U.S. 522, 527 (1975) (internal quotation marks omitted). This requirement of a fair cross section is not without substantial limits -- it does not guarantee that juries be "of any particular composition." Id. at 538. All that is required is that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Id. (emphasis added). The objectives of the fair cross section requirement include avoiding "the possibility that the composition of the juries would be arbitrarily skewed in such a way as to deny criminal defendants the benefit of the common-sense judgment of the community" and avoiding the "appearance of unfairness" that would result from excluding "large groups of individuals, not on the basis of their ability to serve as jurors, but on the basis of some immutable characteristic such as race, gender or ethnic background." Lockhart v. McCree, 476 U.S. 162, 175 (1986).

_____

1. The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a . . . . trial[ ] by an impartial jury of the
State and district wherein the crime shall have been committed . . . ." U.S. Const. Amend. VI.

4

The Jury Selection and Service Act ("The Act") provides as follows:

> [A]ll litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

28 U.S.C. S 1861 (West 2001). The Act "seeks to ensure that potential grand and petit jurors are selected at random from a representative cross section of the community and that all qualified citizens have the opportunity to be considered for service." United States v. Calabrese, 942 F.2d 218, 220 (3d Cir. 1991) (internal quotation marks omitted). Claims under the Act are analyzed using the same standard as a Sixth Amendment fair cross section claim. See United States v. Test, 550 F.2d 577, 584-85 (10th Cir. 1976) (en banc) (Act's fair cross section standard is "functional equivalent of the constitutional`reasonably representative' standard").

When enacted, the Act required "[e]ach United States district court [to] devise and place into operation a written plan for random selection of . . . petit jurors that[would] be designed to achieve the [above-mentioned] objectives of sections 1861 and 1862." 28 U.S.C. S 1863(a) (West 2001). Congress determined that the principal source of names for the random selection should be either "the voter registration lists or the lists of actual voters." Id. at S 1863(b)(2). The Act also provided: "The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 . . . ." Id.

In order to establish a prima facie violation of the fair cross section requirement of the Sixth Amendment and the Act, the defendant must demonstrate: (1) the group alleged to be excluded is a "distinctive" group in the community; (2)

5

the representation of this group in jury venires is not "fair and reasonable" in relation to the number of such persons in the community; and (3) the underrepresentation is caused by the "systematic exclusion of the group in the jury selection process." Duren v. Missouri, 439 U.S. 357, 364 (1979). A defendant need not show discriminatory intent. See id. at 368 n. 26 ("In contrast [to an Equal Protection claim], in Sixth Amendment fair cross-section cases, systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section.") And, "once a defendant has made a prima facie showing of an infringement of his constitutional right to a jury drawn a fair cross section of the community, it is the State that bears the burden of justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." Id. at 368.

The plan approved by the Western District of Pennsylvania at the time of the jury selection in Weaver's case, and currently in effect, employs voter registration lists as the exclusive source from which it summons potential jurors for service. App. at 77. Juror names are drawn at random from the voter registration lists of the seven counties in the Erie Division and placed into a master jury wheel ("master wheel").2Id. At periodic intervals, the Clerk publicly draws names at random from the master wheel. All those selected are sent jury questionnaires. Id.  All those who return questionnaires and are not disqualified, exempt or excused, are placed in a separate wheel called the "qualified wheel." App. at 87.

To prove his claim that the venire underrepresented African-Americans and Hispanics in violation of his constitutional and statutory rights, Weaver introduced the testimony of Dr. Andrew A. Beveridge, who was recognized as an expert in demography. Beveridge compared the number of African-Americans and Hispanics in the adult population of seven counties comprising the Erie Division to the number of African-Americans and Hispanics represented in the master wheels used in the Erie Division since 1995.

_____

2. The master wheel is emptied and refilled every two years. App. at 83.

6

The District Court found the statistical evidence offered for the years prior to 1999 to be too "weak" to "establish unfair and unreasonable representation" because the findings were based on random samples that the District Court found to be inadequate (500 persons for 1995 and 1997). App. at 16. The District Court based this determination in part on Beveridge's concession that a sample size of only 500 "weakens the power of the estimate," and also on his admission that he could not conclude within a reasonable degree of mathematical certainty that there was underrepresentation during either of those years without looking at the entire pattern.3 App. at 251–52. In examining the 1999 evidence, the District Court noted, as testified to by Beveridge and argued by Weaver, that in contrast to 1995 and 1997, Beveridge was able to obtain "a complete statistical breakdown" of the 1999 "master wheel." App. at 15, 99, Appellant Br. at 29.

Beveridge determined that while census figures indicate that 3.07% of the voting population in Erie is African-American, African-Americans comprised only 1.84% of the 1999 master wheel. He also stated that Hispanics comprised .97% of the population, but only .26% of the wheel.4 The absolute disparity, which is calculated by subtracting the percentage of the group on the wheel from the percentage of the group in the relevant population, Ramseur v. Beyer, 983 F.2d 1215, 1231 (3d Cir. 1992) (en banc), is thus 1.23% for African-Americans, and .71% for Hispanics. Using a comparative disparity analysis, 5 which is

_____

3. Weaver does not challenge this finding on appeal, choosing instead to focus on the evidence Beveridge presented regarding all returned questionnaires from 1999.

4. This chart represents the statistics before us:

| 1999 Wheel | Percentage in Population | Percentage in Wheel | Absolute Disparity | Comparative Disparity |
|---|---|---|---|---|
| African-Americans | 3.07 | 1.84 | 1.23 | 40.01 |
| Hispanics | .97 | .26 | .71 | 72.98 |

5. An example of comparative disparity is as follows: in a master wheel of 1000, where a group comprises 50% of the population, yet only makes

7

calculated by dividing the absolute disparity by the percentage of the population that a particular group comprises, id. at 1231, the disparity for African-Americans was 40.01%, while it was 72.98% for Hispanics. This figure "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." Id. at 1231-32.

Beveridge did not perform an additional calculation normally used in fair cross section claims. Known as "standard deviation" analysis, this calculation is only utilized where the expert has performed an analysis based on a random sample from the voter wheel.[6] Here, Beveridge claimed to be analyzing the entire wheel instead of taking a sample.[7] Therefore, he stated that there was no standard deviation calculation. However, Beveridge did perform a "binomial distribution analysis," which measures the

_____

up 25% of the wheel, the comparative disparity is 50%, because half of that group is being excluded. That is, there should be 500 of that group on the wheel, but there are only 250. Hence, there is 50% underrepresentation within the group itself.

6. Beveridge elucidated the concept by offering the following example: in a survey of 800 persons, where the results indicate that 46% of people would vote for Candidate A, and 46% for Candidate B, with a margin of error of 3%, the margin of error establishes the degree of confidence that the figures presented represent the entire voting population, even though the survey is based on a sample of only 800 persons. Beveridge stated that standard deviation is like a margin of error, because it establishes the probability that a sample taken from the jury wheel accurately reflects the composition of the entire wheel. App. at 218.

7. As we will address in our discussion of Weaver's statistical presentation, despite his testimony, Beveridge did not actually analyze the entire master wheel. He testified that he was able to determine the race of nearly every juror on the master wheel based on those jurors indicating their race on the questionnaires sent to them. The master wheel consists of jurors chosen at random from the voter registration rolls, before any questionnaires have been mailed yet. But Beveridge actually examined, and testified based on, the returned questionnaires. For the 1999 wheel, 5,877 questionnaires were mailed. App. at 125. Yet only 4,753 of those were completed and returned. Id. Beveridge did not attempt to account for those not returned, yet consistently testified that he had examined the entire composition of the master wheel.

8

likelihood that the underrepresentation of African-Americans and Hispanics would occur by random chance. Beveridge stated that the likelihood for African-Americans was one in 6,603,384 and for Hispanics, one in 130,337,015.

The District Court first stated that it believed that under our existing precedent, Weaver's claim would fail on the first prong of the prima facie case because African-Americans and Hispanics who do not vote are not cognizable groups. The Court then found that, even assuming that the first prong had been satisfied, Weaver's claim still failed on the basis of the second and third prongs. It held that Weaver's statistical presentation was too limited, and that using voter registration lists to generate the venire did not amount to systematic exclusion. We will address each of the three prongs of the prima facie case identified in Duren, all of which Weaver must satisfy in order to make out a fair cross section claim.

1. First Prong -- Cognizable group

The District Court here framed the issue in the same way we did in United States v. Lewis, 472 F.2d 252, 255 (3d Cir. 1973), decided before the Supreme Court's opinion in Duren. Lewis involved a challenge to the venire selection process based on its alleged underrepresentation of African-Americans. Without the guidance of Duren regarding the prima facie claim, it appears we missed the mark as to what a plaintiff must show in order to demonstrate that a cognizable group was underrepresented. In Lewis , we held that to successfully make out a fair cross section claim, "the defendant must establish that Blacks . . . . choosing not to register to vote were a cognizable group which were systematically excluded." Id. at 256.

We agree with Weaver that Lewis has been overruled by Duren at least insofar as its view of the first prong is concerned. While it is true that persons who do not vote are not a cognizable group, e.g., United States v. Afflerbach, 754 F.2d 866, 869 (10th Cir. 1985) ("Persons who choose not to register to vote do not comprise . . . a cognizable group."), this is not the relevant inquiry. Rather, when a specific population such as African-Americans or Hispanics

9

is claimed to be underrepresented by the voter rolls, the relevant inquiry is simply whether African-Americans and Hispanics are cognizable groups.

This is made clear by Duren, in which the defendant challenged the underrepresentation of women, where Missouri had a procedure that gave women the option of exempting themselves from jury service. 439 U.S. at 360. The Supreme Court noted the proper approach to the first prong:

> With respect to the first part of the prima facie test, Taylor v. Louisiana, without a doubt, established that women are sufficiently numerous and distinct from men so that if they are systematically eliminated from jury panels, the Sixth Amendment's fair cross-section requirement cannot be satisfied.

Id. at 364. Thus, we now evaluate the first prong of the Duren fair cross section test by making the following inquiry: Is the allegedly underrepresented group sufficiently numerous and distinct from others in the population that if members of the group are systematically eliminated, the defendant's right to a jury composed of a fair cross section of the community would be violated?8

Applying this analysis to the instant case, Weaver's claim satisfies the first prong of the Duren test: African-Americans and Hispanics are "distinctive" groups for the purposes of a fair cross-section analysis. Castaneda v. Partida, 430 U.S. 482, 495 (1977) ("[I]t is no longer open to dispute that Mexican-Americans are a clearly identifiable class."); Ramseur, 983 F.2d at 1230 ("African-Americans are unquestionably a constitutionally cognizable group."); see also United States v. Royal, 174 F.3d 1, 6 (1st Cir. 1999)

_____

8. Furthermore, if we were to adhere to Lewis 's theory of the relevant cognizable group, then Duren's second prong, which was not discussed in Lewis, could not be meaningfully applied. As we will discuss, the second prong requires a comparison between the representation of the group in jury venires and the number of such persons in the community. 439 U.S. at 364. Were we to define the relevant group as all African-Americans not registered to vote, as the District Court did, the representation of the group in the jury venire -- and, thus, the numerator in the calculation -- would always be zero.

10

("There is no dispute that . . . Blacks are unquestionably a "distinctive" group for the purposes of a fair cross-section analysis."); United States v. Jackman, 46 F.3d 1240, 1246 (2d Cir. 1995) ("There is little question that both Blacks and Hispanics are "distinctive" groups in the community for purposes of this test."). Thus, we disagree with the District Court's analysis of the first prong of the Duren prima facie case.

2. Second Prong -- "Fair and reasonable"
        representation

The second prong of Duren asks whether the representation of the group in the jury venires is fair and reasonable in relation to the number of such persons in the community. 439 U.S. at 364. This is, at least in part, a mathematical exercise, and must be supported by statistical evidence. Id. "Initially, the defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement." Id. Here, Census figures indicate that 3.07% of the voting population in the seven counties comprising the Erie Division is African-American and.97% is Hispanic. This data has not been challenged; hence, we will proceed on the assumption that these figures are correct.

In Ramseur, we considered a challenge to the jury selection process in Essex County, New Jersey, which used both voter registration and Department of Motor Vehicle lists as the source of its master wheel. 983 F.2d at 1230. Ramseur argued that African-Americans were being excluded in violation of both the Equal Protection Clause of the Fourteenth Amendment9 and the fair cross section

_____

9. No equal protection challenge is made here. It requires a different showing:

        The first step is to establish that the group [alleged to be
        underrepresented] is one that is a recognizable, distinct class,
        singled out for different treatment under the laws, as written or
as
        applied. Next, the degree of underrepresentation must be proved, by
        comparing the proportion of the group in the total population to
the

11

provision of the Sixth Amendment. We found that while the first prong of each test was met, Ramseur's two year-long study establishing 14.1% absolute disparity and 40% comparative disparity presented "insufficient" figures to meet either the Equal Protection or Sixth Amendment standards set forth in Castaneda and Duren, respectively. 983 F.2d at 1233-35. We denied both claims, id. at 1235, focusing the majority of our analysis on Ramseur's Equal Protection challenge, id. at 1229-34.

In our brief discussion of Ramseur's Sixth Amendment claim, we appear to have combined the second and the third prongs of Duren, and stated, generally, that our inquiry involved an examination of "the nature of the process by which jury lists are composed, the length of time of underrepresentation, and the strength of the evidence that purports to establish an `unfair and unreasonable' representation under Duren." Id. at 1235. We determined that, looking at these factors, Ramseur had not made out a prima facie case under the Sixth Amendment. Id. Ramseur presented two years of inconclusive statistical data and the county process was shown to be facially neutral and part of an ongoing process in New Jersey to increase the representative nature of jury lists. Id. Though we considered these two prongs in tandem in Ramseur, here we will evaluate them separately. Following Duren's approach, the strength of the evidence should be considered under the second prong, while the nature of the

_____

proportion called to serve as grand jurors, over a significant period of time. This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class. Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

Castaneda, 430 U.S. at 494-95 (internal quotation marks and citations omitted).

process and the length of time of underrepresentation should be considered under the third.[10]

Looking at the strength of the evidence supporting the second prong, we will examine the percentages of the two populations represented on the master wheel. The government does not challenge Weaver's data indicating that African-Americans and Hispanics comprised 1.84% and .97%, respectively, of the 1999 master wheel. However, the parties do dispute which method of statistical analysis should be used to determine the significance of the disparity between the percentages on the master wheel and the percentages in the voting population.

Weaver urges that we should analyze the figures using comparative disparity, so that the figures of 40.01% for African-Americans and 72.98% for Hispanics would form the basis for this prong. In contrast, the government argues that we should do as the District Court did, and determine whether this second prong has been fulfilled by examining whether the absolute disparity figures of 1.23% for African-Americans and .71% for Hispanics, establish the requisite underrepresentation. Our precedent does not dictate that one method of statistical analysis should be used rather than another,[11] and, in fact, both methods have been

_____

10. In Duren, the Supreme Court decided the second prong based solely on statistical evidence: "The second prong of the prima facie case was established by petitioner's statistical presentation." 439 U.S. at 364. In its analysis of the third prong, the Court discussed the length of time of the study and the nature of the process as they related to whether the underrepresentation was inherent in the system itself: "[Duren's] undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic . . . ," id. at 366, and "Petitioner demonstrated that the underrepresentation of women in the final pool of prospective jurors was due to the operation of Missouri's exemption criteria . . . ," id. at 367.

11. In Ramseur, we did not specify which type of statistical analysis is preferable in these type of cases: "Thus, both the absolute and comparative disparity analyses present results at the margin of the range found acceptable by the courts." 983 F.2d at 1232. Because we did note the results of both calculations, Ramseur supports our determination that we should consider both absolute and comparative disparity, instead of just choosing one over the other.

13

criticized. See, e.g., Thomas v. Borg, 159 F.3d 1147, 1150
(9th Cir. 1998) (stating that "the comparative disparity test
is strongly disfavored in the Ninth Circuit on the ground
that it exaggerates the effect of any deviation."); United
States v. Shinault, 147 F.3d 1266, 1273 (10th Cir. 1998)
(pointing out that with absolute disparity, total exclusion of
group comprising small percentage of population would
result in figure appearing insignificant).

The comparative disparity method has drawn a great deal
of criticism in situations like the one before us, that is,
where a small population is subjected to scrutiny. See
Smith v. Yeager, 465 F.2d 272, 279 n.18 (3d Cir. 1972)
("[T]he comparative [disparity] approach reaches absurd
results . . . where the [African-American] population at the
time was 4.4% of the total, and the [African-American] jury
participation ranged as low as 2% of the jury list). Courts
considering this analysis have said that while "these
numbers may be more indicative of a Sixth Amendment
violation, they . . . are distorted by the small population of
the different minority groups." Shinault, 147 F.3d at 1273.
It has been argued that "a small variation in the figures
used to calculate comparative disparity can produce a
significant difference in the result, and . . . . there is reason
to doubt the accuracy of the figures . . . ." United States v.
Pion, 25 F.3d 18, 23 (1st Cir. 1994); see also United States
v. Sanchez-Lopez, 879 F.2d 541, 548 (9th Cir. 1989) ("A
comparative analysis is disfavored because it exaggerates
the effect of any deviation."); United States v. Hafen, 726
F.2d 21, 24 (1st Cir. 1984) ("[T]he comparative disparity
calculation might be a useful supplement to the absolute
disparity calculation, . . . [but] the smaller the group is, the
more the comparative disparity figure distorts the
proportional representation."); United States v. Whitley, 491
F.2d 1248, 1249 (8th Cir. 1974) (stating that comparative
disparity calculation "is ordinarily inappropriate" where a
very small proportion of the population is involved and
opining that it "distorts reality"). When comparative
disparity has been used, it has been emphasized that the
significance of the figure is directly proportional to the size
of the group relative to the general population, and thus is
most useful when dealing with a group that comprises a
large percentage of the population. See, e.g. , LaRoche v.

14

Perrin, 718 F.2d 500, 502–03 (1st Cir. 1983) (finding that prima facie violation established where comparative disparity was 68.22% and group comprised 68.4% of population), overruled on other grounds by Barber v. Ponte, 772 F.2d 982, 996 (1st Cir. 1985) (en banc).

Although absolute disparity, which was the method employed in Duren, seems to be the preferred method of analysis in most cases, see, e.g., Shinault, 147 F.3d at 1273 ("Absolute disparity . . . is the starting place for all other modes of comparison."), it also has its share of critics. Some courts have found that the absolute disparity calculation "understates the systematic representative deficiencies" in cases such as the one before us, where, unlike in Duren, the groups at issue comprise small percentages of the general population. Id.; see also id. (noting that "even the complete exclusion of the groups would result in absolute disparities of less than 6%"); Rogers, 73 F.3d at 777 ("[I]n this case, even if African–Americans [who comprised 1.87% of population] were excluded entirely from the lists of potential jurors, the maximum disparity, under an absolute calculation, would be 1.87%."). Because we think that figures from both methods inform the degree of underrepresentation, we will examine and consider the results of both in order to obtain the most accurate picture possible.

Looking first at the comparative disparity figures, we find that they are quite high -- 40.01% and 72.98%-- but that because African–Americans and Hispanics comprise such a small percentage of the population, the results of this analysis are of questionable probative value.12 See United States v. Chanthadara, 230 F.3d 1237, 1257 (10th Cir. 2000) (finding that where African–Americans accounted for

_____

12. When determining if "substantial underrepresentation" had been established as required to make out a prima facie claim under the Equal Protection clause, we stated in Ramseur that a 40% comparative disparity was only "borderline." 983 F.2d at 1232. Though an Equal Protection challenge differs from a fair cross section claim, the reasoning
of Ramseur suggests that, with respect to the comparative disparity for African–Americans, 40.1% would not necessarily weigh in Weaver's favor, considering that the figure is comparable to Ramseur's "borderline" figure of 40%.

15

7.9% of population, and Hispanics, 2.74%, comparative disparities of 40.89% and 58.39%, respectively, did not establish prima facie violation); United States v. Clifford, 640 F.2d 150, 155 (8th Cir. 1981) (holding that where Indians comprised 15.6% of population, 46% comparative disparity was insufficient underrepresentation to make out fair cross section claim).

The absolute disparity figures are much lower -- 1.23% for African-Americans and .71% for Hispanics. These percentages are well below those that have previously been found insufficient to establish unfair and unreasonable representation.13 See Thomas , 159 F.3d at 1151 (finding that where African-Americans comprised 5.135% of population, and there were no African-Americans on jury panel, absolute disparity of approximately 5% was insufficient to make out fair cross section claim); Pion, 25 F.3d at 23 (relying on absolute disparity figure of 3.4% in finding that underrepresentation was "relatively small" for Hispanics representing 4.2% of the general population); United States v. Suttiswad, 696 F.2d 645, 649 (9th Cir. 1982) (finding that where African-Americans comprised 9.3% of population, Hispanics, 11.7% and Asians, 8.3%, absolute disparities of 2.8%, 7.7%, and 4.7%, respectively, were insubstantial); United States v. Armstrong , 621 F.2d 951, 955-56 (9th Cir. 1980) (determining that absolute disparity of 2.83% for African-Americans comprising 4.2% of population was not sufficient). Accordingly, the results of this analysis fail to support this element of Weaver's prima facie case.

Moreover, there is a fundamental weakness in the figures relied upon by Beveridge in his statistical presentation regarding the percentages on the "master wheel" -- a flaw that went unaddressed by both the parties and the District Court. As noted previously, despite his testimony, Beveridge did not actually analyze the entire 1999 master wheel. Instead, he examined and based his testimony on the returned questionnaires. For the 1999 wheel, 5,877

_____

13. Like with comparative disparity, Ramseur  found a 14.1% absolute disparity calculation in the Equal Protection context to be "borderline." 983 F.2d at 1232.

16

questionnaires were mailed. App. at 125. Yet only 4,753 of those were completed and returned. Id. Beveridge did not attempt to account for those not returned, yet consistently testified that he had examined the entire composition of the master wheel. We find that this discrepancy in Beveridge's statistical presentation further undermines the strength of the evidence. In order to support Weaver's allegation of underrepresentation on the master wheel, Beveridge would have had to either analyze the races of all 5,877 jurors on the master wheel (as he claimed to have done), perform sampling of the master wheel14 and then calculate the standard deviation,15 or, alternatively, account for the statistical impact of the unreturned questionnaires. Weaver's statistical evidence is, therefore, far too weak to support a finding of representation that is unfair and unreasonable.

3. Third Prong -- Systematic Exclusion

While we need not reach the third prong, it merits our attention because the District Court placed some degree of reliance on this aspect. The third prong of Duren requires that the defendant show that the underrepresentation of the cognizable group is due to systematic exclusion in the jury selection process. 439 U.S. at 366. In Duren, the Supreme Court held that women were systematically excluded where the underrepresentation of women on jury lists resulted from their self-exclusion under a state law exemption privilege. Id. at 367. The Court stated that "[t]he resulting disproportionate and consistent exclusion of women from the jury wheel and at the venire stage was quite obviously due to the system by which juries were selected." Id. In Ramseur, we found no Sixth Amendment

_____

14. Weaver did present studies based on samples of the 1995, 1997, and 1999 wheels, but he did not base his appeal on this evidence, choosing instead to argue that the evidence based on the entire 1999 wheel was much more persuasive. Thus, we will not address Beveridge's studies based on samples from 1995, 1997 or 1999, restricting our focus to the statistical evidence based on all the returned questionnaires from 1999.

15. As noted previously, Beveridge stated that standard deviation was unnecessary because he claimed to have done a complete statistical analysis of the 1999 master wheel.

17

violation where the jury selection process was neutral on its face and was being monitored, and modified, to try to enhance its representative character. 983 F.2d at 1235.

Here, the government contends, and the District Court agreed, that where substantial representation is traceable solely to the exclusive reliance on voter registration lists, and the underrepresented group has freely excluded itself quite apart from the system itself, the third prong has not been fulfilled. The government emphasizes that Weaver has shown "no evidence of any interference with the opportunity . . . to vote." Appellant Br. at 27. In other words, there has been no showing of anything in the system that has discouraged or prevented a group from participating.

We must be careful to note that intentional discrimination need not to be shown to prove a Sixth Amendment fair cross section claim. Duren, 439 U.S. at 368 n. 26. Under Duren, "systematic exclusion" can be shown by a large discrepancy repeated over time such that the system must be said to bring about the underrepresentation: "[Here, petitioner's] undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic -- that is, inherent in the particular jury-selection process utilized." Id. at 366. Thus, while we need not determine the limits of "systematic exclusion" for our purposes, we note that if the use of voter registration lists over time did have the effect of sizeably underrepresenting a particular class or group on the jury venire, then under some circumstances, "this could constitute a violation of a defendant's `fair cross-section' rights under the [S]ixth [A]mendment." Bryant, 686 F.2d at 1378 n.4; see also Barber, 772 F.2d at 989 ("A large discrepancy occurring over a sustained period of time where there is an opportunity for arbitrary selection is sufficient to demonstrate that the exclusion of the underrepresentation is systematic -- that is, inherent in the particular jury selection process utilized."). However, we see nothing in the record before us that is demonstrative of any such persistent "systematic exclusion" of Blacks and Hispanics.

Due to Weaver's failure to present sufficient evidence to satisfy the requirements of the prima facie case set forth in Duren, we will affirm the District Court's denial of Weaver's fair cross section challenge to Erie's jury selection process.

B. Remaining Issues

1. Failure to Grant a Mistrial Based on Non-Production of Bank Teller's Written Descriptions

Weaver also claims that the government violated the Jencks Act, 18 U.S.C. S 3500. The Jencks Act requires that the government disclose prior recorded statements of its witnesses that are "related" to the subject matter of their testimony. Id. at S 3500(b); United States v. Hill, 976 F.2d 132, 139 (3d Cir. 1992). Such disclosures must be made after each witness testifies on direct examination. 976 F.2d at 139.

At trial, several witnesses, including bank tellers, offered evidence as to Weaver's identity, and as we noted, one of the tellers, Ms. Landon, specifically recalled Weaver from his having opened an account at the bank five months before the robbery. Weaver contends that the Jencks Act was violated because, after direct examination of the various tellers, Weaver's counsel requested copies of written reports prepared by each of them describing the robber. The government was unable to produce any such reports. Therefore, Weaver urges that he was entitled to a mistrial. We review the District Court's denial of defendant's motion for a mistrial for abuse of discretion. Id.

It was conceded that it is bank policy for tellers to write a description of a robber immediately following the robbery. Indeed, shortly after the robbery, each of the three tellers did so and there was some evidence that they left them at the scene or gave them to some unidentified law enforcement officials who arrived on the scene. None of the tellers, however, could remember to whom they gave the descriptions and thus the District Court concluded that there was no evidence that the written descriptions were ever in the custody of federal law enforcement officials.16

_____

16. Although each teller testified on cross-examination that she wrote such a statement immediately after the robbery occurred, none of the

19

Because the Jencks Act only applies to evidence in the possession of the United States, and not state authorities, see 18 U.S.C. S 3500(b) ("in the possession of the United States"); United States v. Bermudez, 526 F.2d 89, 100 n.9 (2d Cir. 1975); United States v. Smith, 433 F.2d 1266, 1269 (5th Cir. 1970); Beavers v. United States, 351 F.2d 507, 509 (9th Cir. 1965), we conclude there was no showing of a Jencks Act violation.

2. Notice of Intent to Seek Life Imprisonment Under
        the Provisions of Title 18 U.S. Code 3559 (c)(1)

Pursuant to 18 U.S.C. S 3559(c)(1)(A)(i),"a person who is convicted in a court of the United States of a serious violent felony shall be sentenced to life imprisonment if the person has been convicted . . . on separate prior occasions in a court of the United States or of a State of 2 or more serious violent felonies." Id. This is routinely referred to as the "Three Strikes" provision. Weaver contends that the government's February 10, 2000 notice of its intent to seek a sentence of life imprisonment under this statutory provision was defective because it failed to properly inform him of the nature of the prior convictions relied upon, and thus provided him inadequate notice. The sufficiency of such notice is a question of law that we review de novo. United States v. King, 127 F.3d 483, 487 (6th Cir. 1997).

Notice of intent to seek life imprisonment under the provisions of 18 U.S.C. 3559(c)(1) requires notice under 21 U.S.C. S 851, which states:

> (a)(1) No person who stands convicted of an offense
> under this part shall be sentenced to increased
> punishment by reason of one or more prior convictions,
> unless before trial, or before entry of a plea of guilty,

_____

tellers could recall to whom she gave the written description. App. at 486–88, 525–26, 560–61. Teller Landon testified that she did not recall if she had given her written description form to law enforcement personnel, stating that "[p]erhaps they took it, I don't remember who got the form." Agent Curtis and Officer Emrick both testified that they did not see any written statements by the tellers, App. at 535–36, 691, 698, and neither the Erie Police Department nor the bank had any written descriptions of the robber by the tellers, App. at 567, 683, 868.

the United States attorney files an information with the
court (and serves a copy of such information on the
person or counsel for the person) stating in writing the
previous convictions to be relied upon. . . . Clerical
mistakes in the information may be amended at any
time prior to the pronouncement of sentence.

(c)(1) If the person denies any allegation of the
information of prior conviction, or claims that any
conviction alleged is invalid, he shall file a written
response to the information. . . . The failure of the
United States attorney to include in the information
the complete criminal record of the person or any facts
in addition to the convictions to be relied upon shall
not constitute grounds for invalidating the notice given
in the information required by subsection (a)(1) of this
section.

21 U.S.C. S 851. The requirements set out in S 851 are
mandatory and a district court may not impose an
enhanced sentence unless the defendant has been notified
of the "strikes" in compliance with these provisions. United
States v. Olson, 716 F.2d 850, 853 (11th Cir. 1983). The
government gave notice to Weaver of its intent to rely upon
three prior convictions: a "July 3, 1975 conviction for
involuntary manslaughter," a "November 21, 1977
conviction for armed robbery," and a "June 19, 1989
conviction for armed robbery." It later amended the notice
in certain respects, as we will discuss below. Weaver
contends that the government's notice was flawed in three
ways.

First, one of the previous convictions set forth in the
notice sent to Weaver contained an error, in that it
indicated that his July 3, 1975 conviction was for
"involuntary manslaughter," when it was actually for
"voluntary manslaughter." Second, the original notice sent
to Weaver indicated that one of the prior convictions that
the government would rely upon was his November 21,
1977 conviction for armed robbery. In fact, there was no
crime in Pennsylvania entitled "armed robbery" in 1977.
Rather, on November 21, 1977, Weaver was found guilty of
two separate robberies that were consolidated for trial and,
with respect to one of the two robbery convictions, the jury

21

also convicted Weaver of using a "prohibited offensive weapon."

Finally, the reference to Weaver's third conviction improperly referred to an armed robbery conviction on June 19, 1989. Weaver was originally convicted on June 19, 1989, but the conviction was not for armed robbery. Instead, Weaver had been convicted of two separate charges of robbery and criminal conspiracy relating to the robbery of two banks on the same day, and both convictions were later vacated and re-entered on July 2, 1997.

We have not had occasion to specifically address the sufficiency of notice under S 851. However, we are guided by rulings of our sister courts of appeals in assessing the adequacy of a S 851 information. While continually emphasizing the need for strict compliance with S 851(a)(1)'s filing and service requirements, e.g., Harris v. United States, 149 F.3d 1304, 1307 (11th Cir. 1998) ("[E]ven where a defendant receives actual notice that the government intends to rely on a previous conviction to enhance his sentence, the district court lacks jurisdiction to impose an enhanced sentence until the government files an information as required under S 851."), those courts requiring strict compliance have drawn a distinction between the strict procedural requirements regarding the giving of notice, such as service and filing, which are explicit in the statute, and the precise information that must be included in an information, which the statute does not specify. Courts have often found that the statute permits more flexibility with respect to the latter. E.g., United States v. Hamilton, 208 F.3d 1165, 1168-69 (9th Cir. 2000) (finding that though the Ninth Circuit requires strict compliance with "the procedural aspects of section 851(b), . . . an apparent typographical mistake in a section 851(a) sentencing information that otherwise satisfies due process notice requirements does not render the information invalid."); United States v. Lawuary, 211 F.3d 371, 376 (7th Cir. 2000) ("The statute itself . . . does not specify the form the filing must take, and we have . . . been flexible with regard to what the government must do in order to comply with section 851.").

22

Rather than focusing on exactly what information the government must provide in a S 851(a)(1) information, courts have instead analyzed whether the purpose of S 851(a)(1) -- providing a defendant with sufficient notice to comply with due process -- has been satisfied. Accordingly, "[o]ur inquiry must be whether the information which was filed provided [the defendant] reasonable notice of the government's intent to rely on a particular conviction and a meaningful opportunity to be heard," Perez v. United States, 249 F.3d 1261, 1266 (11th Cir. 2001), and we must be careful not to "elevat[e] form over substance" in doing so. King, 127 F.3d at 489. Hence, the question is whether any of the government's errors rendered the notice constitutionally lacking. United States v. Steen , 55 F.3d 1022, 1027 (5th Cir. 1995) ("[A] district court may enhance a defendant's sentence, as long as the government provides constitutionally sufficient notice of the previous convictions through an information filed prior to trial."). We note, also, that S 851(a)(1) specifically provides that"[c]lerical mistakes in the information may be amended at any time prior to the pronouncement of sentence." We will address each of the claimed errors.

(a) Voluntary Manslaughter

Weaver contends that the notice wrongly indicated he had been previously convicted of involuntary manslaughter. More than two weeks before sentencing, the government filed an amended notice, correcting the error by listing Weaver's July 3, 1975 conviction as being for voluntary manslaughter. The District Court determined that this error was a clerical mistake that could be amended pursuant to the plain language of the statute.

We agree with the District Court that the government's error in listing Weaver's past crime as being for "involuntary manslaughter," when it was actually for "voluntary manslaughter," was a clerical mistake and therefore capable of being corrected by amendment under S 851(a)(1). See King, 127 F.3d at 489 (determining that incorrect date of prior conviction included in information is clerical mistake as referenced in S 851(a)(1)). Although Section 851 does not define "clerical error," we conclude that the weight of authority discussing clerical errors in

23

other contexts indicates that the government's error qualifies as such. See Fed. R. Civ. P. 60(a) ("Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected . . . ."); Fed. R. Crim. P. 36 ("Clerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission  may be corrected . . . .") (emphasis added); see also American Trucking Ass'ns v. Frisco Transp. Co., 358 U.S. 133, 145 (1958) ("It is axiomatic that courts have the power and the duty to correct judgments which contain clerical errors or judgments which have issued due to inadvertence or mistake."); Jones v. Anderson-Tully Co., 722 F.2d 211, 212 (5th Cir. 1984) (holding that clerical errors "must be in the nature of recitation" and "not errors of substantive judgment"). Because the government's amended information complied with S 851(a)(1)'s requirements for the amendment of clerical errors, we affirm the District Court's holding that the government listing Weaver's offense as "involuntary manslaughter" instead of "voluntary manslaughter" did not render the S 851 notice inadequate.

(b) November 21, 1977 Conviction for Armed Robbery

With regard to the listing of Weaver's November 21, 1977 conviction as being for armed robbery, the District Court correctly noted that Pennsylvania did not have an offense titled "armed robbery" in 1977. Weaver was actually convicted of two counts of robbery, one of which involved a "prohibited offensive weapon."

First, Weaver argues that because the government's original notice stated that it was relying on a conviction on November 21, 1977 (singular), instead of on two convictions (plural), the notice did not comply with S 851(a)(1). However, the government did in fact correct this error in the amended notice, changing a single conviction for armed robbery on November 21, 1977 to a "November 21, 1977 conviction for robbery" and a "November 21, 1977 conviction for armed robbery." App. at 948. We agree with the District Court that this mistake can be classified as clerical, and due to the fact that the amended notice accurately reflected that the government was relying on two

24

robbery convictions, rather than one, Weaver's argument is unpersuasive.

Weaver's second contention is that he was prejudiced by the incorrect notice[17] because he could not identify upon which of the two 1977 robbery convictions the government was relying. He bases this argument on the fact that under S 3559(c)(3), a robbery conviction can not constitute one of his "strikes" for sentencing purposes if a defendant "establishes by clear and convincing evidence that (i) no firearm or other dangerous weapon was used in the offense and no threat of use of a firearm or other dangerous weapon was involved in the offense; and (ii) the offense did not result in death or serious bodily injury . . . to any person." He asserts that if the government had given him proper notice, he could have attempted to prove that an offensive weapon was not used in one of the robberies.

We are not swayed by Weaver's argument. We have already stated that the amended notice clarified that the government was relying upon both convictions entered on November 21, 1977. And though the amended notice still listed "armed robbery," instead of robbery and use of prohibited weapon, as a relied-upon conviction, given that the government listed the correct date on the amended notice and attached copies of his certified convictions, we cannot see how Weaver's supposed confusion renders the notice insufficient. Weaver was alerted to the convictions

_____

17. We agree with Weaver that a S 851(a) violation is not subject to harmless error analysis. See United States v. Olson, 716 F.2d 850, 852 (11th Cir. 1983) (holding that if government fails to provide notice, it cannot seek enhancement; there is no room to argue that error was harmless). But that is not the aim of our prejudice inquiry. Rather, as discussed earlier, we are asking whether Weaver was prejudiced in order to determine whether he was given adequate notice, as required by due process, of the previous convictions upon which the government would rely. See Steen, 55 F.3d at 1027 (emphasis added) ("[A] district court may enhance a defendant's sentence, as long as the government provides constitutionally sufficient notice of the previous convictions through an information filed prior to trial."); United States v. Belanger, 970 F.2d 416, 419 (7th Cir. 1992) ("Section 851 does not specify the particular form which notice of enhancement must take and the government's filings provided Belanger reasonable notice and an opportunity to be heard.").

the government would rely on as strikes, and he had the ability to challenge the use of both robbery convictions. He could have argued that a weapon was not used in one of his robberies, thereby attempting to avail himself of S 3559(c)(3)'s exception. He did not do so, and we do not believe that technical errors such as the ones here give him the opportunity to revisit the issue on remand.

In addition, prior to his trial, Weaver filed two in limine motions to exclude his prior convictions for bank robbery, armed robbery and manslaughter. Hence, the pretrial proceedings clearly indicate that he was well aware of the prior convictions that the government was relying upon, further weakening his claim that he lacked sufficient information to put him on notice. See United States v. Mack, 229 F.3d 226, 231–32 (3d Cir. 2000) (considering actual notice as indicative of constitutionally adequate notice in context of different statute).

Some element of confusion or lack of specificity has not rendered notices deficient in previous cases. E.g., United States v. Gonzalez–Lerma, 14 F.3d 1479, 1485 (10th Cir. 1994) (upholding information with no prior case number, date or specific place of conviction); United States v. Campbell, 980 F.2d 245, 251 (4th Cir. 1992) (upholding enhancement despite error in statutory section of previous conviction). Thus, we hold that the government's information regarding Weaver's November 21, 1977 conviction was sufficient to "signal[ ] the government's intention to rely upon a particular prior conviction." Gonzalez–Lerma, 14 F.3d at 1486.

(c) 1989 Armed Robbery Conviction

Finally, Weaver contends that because his convictions for armed robbery and criminal conspiracy on June 19, 1989 were later vacated, the government listed nullified convictions. However, the convictions were vacated July 2, 1997 and were re-entered, after a guilty plea, under the same criminal docket number on July 2, 1997. Hence, the only error is listing the wrong date of conviction. We classify this as nothing more than a clerical mistake that, like the other errors we have addressed, was corrected in the amended notice. Thus, we apply the same reasoning, and find that this mistake does not entitle Weaver to relief.

26

Weaver also argues that the notice was inadequate because he was not convicted of armed robbery on that date, but rather of two separate charges -- robbery and criminal conspiracy -- relating to the robbery of two banks on the same day. Here, our analysis is the same as it was with the second mistake regarding the armed robbery convictions, that is, we are persuaded that the government's information was sufficient to "signal[ ] the government's intention to rely upon a particular prior conviction." Gonzalez-Lerma, 14 F.3d at 1486. Thus, we find that Weaver received adequate notice that the government would rely on his July 2, 1997 robbery conviction.

Therefore, we find that the notice was sufficiently complete to provide Weaver with satisfactory notice under the statute, and that the District Court was correct in not permitting Weaver, in effect, to take advantage of technical or clerical errors in the notice provided. Therefore, we hold that the District Court did not err in finding Weaver received adequate notice as per 18 U.S.C. S 851.

3. Increasing Sentence Based on Prior Convictions Not
        Charged in Indictment nor Proven to the Jury
        Beyond a Reasonable Doubt

Weaver contends that the failure to include his prior convictions for serious violent felonies in the indictment and to charge the jury that it must find beyond a reasonable doubt that Weaver committed those prior offenses violated his right to due process or trial by jury. Our review of this issue is plenary. Mack, 229 F.3d at 231 ("This Court reviews de novo Mack's assertion that his due process rights were violated.").

In Almendarez-Torres v. United States, 523 U.S. 224 (1998), the Supreme Court addressed this precise issue. There, the Court decided that no due process violation occurs when prior convictions are used to increase a statutory maximum without being charged in an indictment and proved to a jury beyond a reasonable doubt. Id. at 239-41. Recently, in Apprendi v. New Jersey, 530 U.S. 466 (2000), the Court upheld the validity of Almendarez-Torres, singling out "the fact of a prior conviction" as the exception

27

to the rule that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490.

Despite speculation about the future of Almendarez-Torres,18 we heed the words of the Supreme Court in Rodriguez de Quijas v. Shearson/Am. Express, Inc. , 490 U.S. 477, 484 (1989): "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Nor do we find, as Weaver argues, that the "Three Strikes" requirement of a mandatory minimum sentence is distinguishable, for due process purposes, from the increased permissive maximum penalty discussed in Almendarez-Torres. Both have the effect of increasing the

_____

18. We note Chief Judge Becker's concurrence in Mack, which highlighted the shaky ground on which Almendarez-Torres stands:

    [T]he Apprendi majority went out of its way to cast the future
    viability of Almendarez-Torres into question. See id. at 2362
("Even
    though it is arguable that Almendarez-Torres  was incorrectly
    decided, and that a logical application of our reasoning today
should
    apply if the recidivist issue were contested, Apprendi does not
    contest the decision's validity and we need not revisit it for
purposes
    of our decision today to treat the case as a narrow exception to
the
    general rule we recalled at the outset."). Moreover, as
commentators
    have noted, five sitting Justices are now on record as saying that
    Almendarez-Torres was wrongly decided. See Apprendi, 120 S.Ct. at
    2379 (Thomas, J., concurring); Almendarez-Torres, 523 U.S. at 248,
    118 S.Ct. 1219 (Scalia, J., joined by Stevens, Souter, and
Ginsburg,
    dissenting). I do not suggest that we should predict that the Court
    will overturn Almendarez-Torres. Cf. State Oil Co. v. Khan, 522
U.S.
    3, 20, 118 S.Ct. 275, 139 L.Ed. 2d 199 (1997) ("Despite what Chief
    Judge Posner aptly described as Albrecht's `infirmities, [and] its
    increasingly wobbly, moth-eaten foundations,' there remains the
    question whether Albrecht deserves continuing respect under the
    doctrine of stare decisis. The Court of Appeals was correct in
    applying that principle despite disagreement with Albrecht, for it
is
    this Court's prerogative alone to overrule one of its precedents.")

(emphasis added) (citation omitted). But the apprehension remains. Mack, 229 F.3d at 239 n.5.

sentence, based on findings not charged or made by the jury, beyond what would otherwise be the statutory maximum. Therefore, we find that the District Court properly rejected Weaver's claim that the failure to include his prior convictions for serious violent felonies in the indictment, and to charge the jury that it must find beyond a reasonable doubt that Weaver committed those prior offenses, violated his right to due process or trial by jury.

CONCLUSION

For all the foregoing reasons, we will AFFIRM the District Court's Judgment and Conviction Order.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

29